NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0680n.06
Filed: September 8, 2006

No. 05-3519

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CAROLINE WATSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT COURT |
| | ) | FOR THE NORTHERN DISTRICT OF |
| CITY OF CLEVELAND, CLEVELAND | ) | OHIO |
| CIVIL SERVICE COMMISSION, JANE | ) | |
| CAMPBELL, EDUARDO ROMERO, | ) | |
| JONALYN KRUPKA | ) | |
| | ) | |
| Defendants-Appellees, | ) | |

Before: BOGGS, Chief Circuit Judge; GIBBONS and GRIFFIN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Caroline Watson ("Watson") sued the City of

Cleveland ("the City"); its mayor, Jane Campbell ("Campbell"); its former Director of Personnel,

Eduardo Romero ("Romero"); its Civil Service Commission ("CSC"); and the Secretary to the CSC,

Jonalyn Krupka ("Krupka"), in the United States District Court for the Northern District of Ohio.

Watson alleged racial discrimination, retaliation, and constructive discharge in violation of Title VII

of the Civil Rights Act of 1964 and Ohio Rev. Code § 4112, as well as a denial of a property right

guaranteed by the Fourteenth Amendment in violation of 42 U.S.C. § 1983. Watson also alleged civil

conspiracy; fraud; and negligent hiring, retention, and supervision in violation of state law. The

-1-

district court granted summary judgment to the defendants on all of Watson's claims, and she appealed. She also appealed the district court's denial of a motion to compel discovery. We affirm the district court for the following reasons.

I.

Watson, an African-American female, began working for the City in 1998. The City's former mayor, Michael White — who was also African-American — hired Watson as a Project Coordinator in the City's Department of Personnel ("Personnel") and charged her with various labor relations responsibilities. She functioned as an Equal Employment Opportunity ("EEO") Officer and later as the EEO Manager. Her primary job responsibility was investigating charges of discrimination and harassment leveled against the City by its employees.

A change in mayoral administration took place in Cleveland in 2001. Campbell, who is Caucasian, took office as mayor in January 2002. Prior to Campbell's inauguration, the Director of Personnel ("Director") during Mayor White's administration, Jeffrey K. Patterson, resigned. Accordingly, Mayor Campbell appointed a new Director.[1] She selected Romero,[2] who had been a

---

[1] Appointment power is given to the mayor by the Cleveland City Charter. The Charter permits the mayor to appoint heads of departments and commissions. These political appointments are made outside the normal hiring process for the City, which is dictated by the CSC. Ordinarily, the CSC compiles lists of employees who have taken the Civil Service exams required for specific positions. These lists rank the employees by their scores on the exams. When there is a vacancy, the CSC identifies the top three candidates on the list for interviews if a list exists for the open position. If there is no list, Personnel selects interview candidates by reviewing the resumes of people who have applied for City positions.

[2] Watson describes Romero as "a Hispanic male" in her brief, but the appellees contend in their brief that the term Hispanic does not accurately describe Romero's race. The Appellee's Brief states that "Director Romero was of mixed race, because of his North and South American indigenous Indian and Caucasian ancestry. He did not consider Hispanic a descriptive term of his

-2-

District Director for the Ohio Bureau of Worker's Compensation. Romero's appointment and his actions as Director precipitated Watson's complaint.

When Romero started as Director, Watson was absent from work, mourning the death of her grandmother. Watson testified in her deposition that "[she] came back and asked people had [Romero] met with them." Watson testified that she expected a meeting between Romero and the Personnel employees to have taken place because "[she] had never met a man to come in the office and assume a position, a high-level position, and didn't request to meet with the employees." According to Watson's deposition, the response she received from "[e]veryone" was "no, he didn't meet--he's sitting up in his office with the door closed, and the only persons that was running in there are the white employees, and he won't meet with people." Watson testified in her deposition that Romero "wouldn't meet with a lot of the black employees. For instance, he wouldn't meet with me." Romero, however, did meet with Watson when she requested it, and Watson acknowledged in her deposition testimony that this meeting took place.

Nevertheless, Watson maintained in her deposition that Romero "didn't want anything to do with the black employees" because he and the Campbell administration "distrust[ed]" African-Americans because of their race and their perceived loyalty to the former mayor and wanted to "force them out." Watson testified that in her opinion "basically all the blacks in Mike White's cabinet level were fired[, and] Jane Campbell kept whites in Mike White's administration."

Employment data amassed by the City contradicts Watson's assertion that the Campbell administration did not want to employ African-Americans; fifty-four percent of the new employees

race." The record, however, contains no evidence of Romero's ethnicity.

-3-

hired by the Campbell administration were African-American.

Despite the numbers, Watson claims that the Campbell administration discriminated and points to the experiences of African-American employees in Personnel as evidence. Watson testified that she believed that Patterson was fired as Director, even though she does not know that for sure. Watson said she "look[ed] at it" as if Patterson was fired by the Campbell administration because "he wasn't retained by Jane Campbell as she had done with other whites and Hispanics, so [she] believe[d] he was fired." She acknowledged in her deposition that this was merely her belief and that she was "not sure" of the circumstances surrounding Patterson's resignation as Director. Watson also asserted in her deposition that Betsey McCafferty, the Chief of Personnel Management and the second-highest ranking employee in Personnel, was "forced out by the Campbell administration[, and] [e]veryone knows that." She claims that McCafferty left the City because she was "frazzled," treated poorly, and falsely accused of bringing a gun to work. The connection between McCafferty's leaving Personnel and the racial discrimination alleged by Watson is unclear, however, because Watson conceded in her deposition that, even though "[m]ost people thought [McCafferty] acted black, . . . she was probably white." Further, Watson claimed in her deposition that Romero "took away job responsibilities" from African-American employees, Tony Washington and Hernando Harge. These employees participated in union negotiations during the White administration, but Romero shifted that responsibility to the Law Department. Watson also testified that Romero eliminated her job responsibilities by directing EEO investigations to the Law Department.

In addition to generally testifying that "Romero attempted to force out the black professional employees in the Department of Personnel and human resources" because they "got [sic] the big

bucks , [and] got [sic] the big positions . . . . that [the Campbell administration] wanted" for white employees, Watson complained about four specific events in her complaint and deposition testimony. They are: (1) the failure to post vacancies and follow the Civil Service Rules; (2) Watson's exclusion from departmental and strategic planning meetings; (3) the raises given to some employees in Personnel; and (4) the City's response to her charges of discrimination against Romero.

Watson claims that she was denied the opportunity to apply for two vacant positions. The positions were Labor Relations Officer ("LRO"), which had been held by Hernando Harge until he resigned and Chief of Personnel Management ("CPM"), which had been held by McCafferty until she resigned. Watson complains that Romero failed to post the vacancies on the City's job board and misled her about the availability of the CPM position. She further claims that Romero, with the help of Krupka, violated the Civil Service Rules[3] with respect to hiring for these positions.

Watson inquired of Romero about the vacancy for CPM, and according to her deposition testimony, he indicated that the position was filled. Watson believes that the position was filled by Genesis Brown even though he never assumed the title. Brown, who is Caucasian and campaigned for Campbell, was hired into the newly created position of Data Processing Supervisor on February 11, 2002. Brown testified that his civil service job consisted of training staff members in technology,

_____

[3] Watson claims that the Civil Service Rules require the City to make the hiring process competitive, which she interprets as advertising the jobs, posting vacancies, and actively seeking candidates. The summary of the hiring process introduced as an exhibit at Watson's deposition indicates otherwise. According to a flow chart that depicts the City's hiring procedure, job vacancies do not have to be posted and open positions do not have to be advertised. For nonunion positions, such as the ones Watson claims she was denied the opportunity to apply for, the City must consult the Civil Service list if it exists. If no list exists, the City hires from the pool of applicants who have submitted resumes.

completing public information requests, preparing weekly reports, "help[ing] with contracts," assisting with budgeting, and attending cabinet and operational group meetings. Brown moved into the office vacated by McCafferty. Three-to-four months after he began working for the City, Brown's title was changed to Administrative Assistant to reflect the greater responsibilities he had assumed. Approximately six months after he began working for the City, Mayor Campbell appointed Brown Secretary to the Director or Assistant Director of Personnel.

Watson contends in her brief that Brown was the *de facto* CPM when he filled each of these positions. She claims he was not given that title because he lacked the civil service qualifications for the job. Romero testified, however, that CPM was never filled and that Data Processing Supervisor was an entirely new position with different responsibilities than the CPM position. Additionally, the Cleveland City Charter provides for the Assistant Director position, which is politically appointed and higher in the organizational chart than CPM, but it had not been filled in the White administration.

Watson never applied for the LRO position but testified that she would have if the vacancy had been posted and applications solicited. Instead of posting the vacancy and soliciting applications, as Watson claims the Civil Service Rules require, Romero hired Madeline Corchado. Corchado, whom Romero testified he assumed was Hispanic, worked in the Labor Relations group for the City's Utilities Department and had expressed an interest in transferring to Labor Relations in Personnel. When the LRO position became vacant, Romero asked Corchado if she was interested in it. She was, and Romero hired her. Watson claims Corchado's hiring denied Watson her right to apply for the LRO job.

In addition to claiming that she was denied her right to apply for other positions within Personnel, Watson claims that Romero excluded her from meetings. Watson emailed Romero on May 29, 2002, complaining that he had not invited her to Personnel's weekly management meetings and strategic planning sessions. She identified employees whom she learned had participated in the strategic planning sessions—Tom Antonello, Genesis Brown, and Sue Rudman. Incidentally, none of these employees were African-American. Romero responded to her email on May 31, 2002. He told her that his failure to include her in the weekly management meetings was an oversight, which he had corrected. He also gave her a complete list of the employees who participated in the strategic planning sessions. Among them were Dennis Dove, Hernando Harge, and Tony Washington, all of whom were African-American employees hired by the White administration. The email and the invitation to the weekly managers meetings did not appease Watson. In her deposition, she complained about not being invited to the strategic planning sessions and speculated that there were many other meetings to which she had not been invited.

Watson also claims that she was improperly denied a raise because Romero increased employees' salaries in a discriminatory fashion. Romero, with the approval of Mayor Campbell and the City's Director of Finance, gave four employees raises from funds freed up when an employee retired. Genesis Brown received a $20,000 raise, which coincided with his promotion to Assistant Director. Maria Claudio and Susan Rudman each received a $5,000 raise, and Linda Steffen received a $10,000 raise. Romero told Watson he selected these employees for raises because they were (1) long-term City employees; (2) vitally important to Personnel; or (3) both. Romero aimed to bring their salaries in line with the pay they could receive in the private sector. When Watson heard about

-7-

these raises, she emailed Romero to request a raise. She asked Romero to meet with her to discuss giving her a merit increase, which she felt she deserved. Romero met with her on September 26, 2002, to explain why she did not receive a raise. He indicated that raises were given based on the employees' long-term role in Personnel. Watson inferred from this that Romero did not "see [her] playing any role in the future of the department." She emailed him after the meeting to clarify his vision of her role in the department ; it is unclear whether Romero and Watson ever discussed the Personnel raises again. Watson concluded that he gave the four employees raises "because they were white."

Finally, Watson complains about the City's response to her discrimination charges against Romero — a response she characterizes as retaliatory. Watson filed an EEO complaint against Romero after an incident in January 2003. Romero chastised Watson for requiring employees to submit their EEO complaints in writing and ordered her to begin accepting verbal complaints. Watson emailed Romero to explain that she encouraged written EEO complaints but did not require them. She also alleged that the Law Department had been taking away her job responsibilities by investigating EEO complaints and accused Romero of treating her in a discriminatory fashion. Watson met with Mayor Campbell on January 21, 2003, to complain about Romero but refused to discuss her problems because representatives of the Law Department were present. She believed their presence jeopardized her interests. Watson then filed a formal EEO complaint against Romero on March 10, 2003. The cluster-chief for the Personnel and Human Resources departments, Robert Baker, appointed an independent investigator to investigate Watson's allegations. Baker also removed Watson from two EEO investigations because of a conflict of interest. One of the EEO

claims was a precursor to Watson's complaint, and the other EEO complaint was against the Law Department, which Watson believed operated contrary to her interests. Watson complained about her removal and described it as retaliatory. Baker emphasized that he removed her to appoint independent investigators, not to discipline her or criticize her work. He refused to meet with Watson to discuss the conflicts because she would not permit a member of the Law Department to be present. Watson continued to contest her removal from these investigations. She claims the City took away her primary job function, investigating EEO complaints, in retaliation for her complaint against Romero.

Watson resigned from the City in August 2003 because her job was causing her stress, which manifested itself in hair loss, weight loss, insomnia, and anxiety.

She filed suit on November 23, 2003, in the United States District Court for the Northern District of Ohio, naming the City, Mayor Campbell, Romero, the Secretary to the CSC, and the CSC as defendants. Watson asked to depose Mayor Campbell, and the defendants sought a protective order. Their protective order was granted, and Watson's motion to compel was denied. Later, the defendants moved for summary judgment, and the district court granted their motion. Watson timely appealed both the summary judgment order and the denial of the motion to compel discovery.

II.

Watson appeals the district court's denial of her motion to compel Mayor Campbell's deposition. On appeal, denials of motions to compel discovery are reviewed only for an abuse of discretion. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). We conclude that the district court acted within its discretion to set the scope of discovery by refusing to force Mayor

Campbell to submit to a deposition. We find no abuse of discretion because Watson fails to demonstrate why deposing Mayor Campbell is necessary to her case. Her case focuses on actions undertaken by various members of the Campbell administration and involves Mayor Campbell only to the extent that the Mayor supervises city employees. Mayor Campbell has very little information related to Watson's claims and indeed none that is unavailable from another source. Watson claims that she needs to depose Mayor Campbell to learn the results of a probe Mayor Campbell launched to investigate Watson's discrimination claims. The results of the investigation, however, could be obtained through a form of discovery less burdensome to a city executive—namely, interrogatories and requests for production. Given that Watson can obtain the information she seeks through other forms of discovery, the district court did not abuse its discretion in denying her motion to compel Mayor Campbell's deposition.

### III.

In addition to appealing the district court's refusal to compel Mayor Campbell's deposition, Watson appeals the district court's grant of summary judgment to the defendants on all her claims.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although all "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment must be entered against the opposing party if it "fails to make a showing sufficient to establish the existence of an element essential to . . . [its] case, and on which . . . [it] will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If "a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This court reviews the grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).

On *de novo* review, we conclude that the district court properly granted the defendants' motion for summary judgment. As discussed below, Watson failed to raise genuine issues of material fact, and the defendants are entitled to judgment as a matter of law.

### A. Racial Discrimination

Ohio and federal anti-discrimination laws prohibit employers from discriminating on account of race in hiring as well as in setting the terms, conditions, and privileges of employment. 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02. The standards for proving racial discrimination are the same under Ohio and federal law because Ohio applies the body of federal case law interpreting Title VII to determine if an allegedly discriminatory practice violates its anti-discrimination statute. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). To prove racial discrimination, a plaintiff may put forth direct evidence of discrimination or present circumstantial evidence that permits an inference of discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003) (identifying methods of proof for a Title VII claim premised on racial discrimination).

Watson attempts to prove her case solely with circumstantial evidence. Therefore, she must create a presumption of unlawful discrimination and challenge the defendants to rebut the presumption by legitimating their actions. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

252 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To create the presumption of discrimination, Watson must prove a prima facie case of employment discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 252-53. She must establish that 1) she was a member of a protected class; 2) she was subject to an adverse employment action; 3) she was qualified for the job; and 4) for the same or similar conduct, she was treated differently from similarly situated non-minority employees. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

Watson fails to establish her prima facie case of racial discrimination at step two. She has put forth no evidence that the defendants subjected her to an adverse employment action. An adverse employment action requires a materially adverse change in the terms and conditions of employment. *Allen v. Mich. Dep't. of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999). A materially adverse employment action

> must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Kocis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996), *citing Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Watson has put forth no evidence that she was subjected to an adverse employment action under any of these factors. She remained EEO Manager until she chose to quit, and the defendants did not reduce her compensation or benefits or demote her. She claims that the defendants diminished her job responsibilities by removing her from EEO investigations and directing EEO complaints to the Law Department. The record, however, does not indicate that such an adverse employment action took place. Watson was removed only from two

EEO investigations and then only to cure potential conflicts of interest. This was not a significant diminution in her job responsibilities because she remained responsible for investigating any new EEO complaints that were filed and completing any EEO investigations that were in progress.

Watson tries to prove that she was the victim of an adverse employment action by pointing to "other indices that [were] unique to the particular situation." She complains that she did not receive a raise, was denied overtime, was prevented from applying for jobs, and generally was treated poorly because of her race. These could be indices of an adverse employment action had Watson raised a genuine issue of material fact about their occurrence. Instead, she relied on her deposition testimony, which merely reiterated her belief that she was a victim of racial discrimination. This deposition testimony is insufficient to raise a genuine issue of material fact because it contains no more than "[m]ere personal beliefs, conjecture and speculation." Watson's personal belief that she and others suffered from adverse employment actions motivated by racial discrimination cannot help Watson avoid summary judgment. *See Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (holding that an inference of discrimination cannot be supported merely by the plaintiff's personal beliefs and speculation that the defendant impermissibly discriminated).

Watson also claims that the defendants subjected her to an adverse employment action by preventing her from applying for the CPM and LRO positions. This claim can be recast as a failure to promote claim with respect to the CPM position because that position is higher on the organizational chart than Watson's EEO Manager position. But Watson's claim that she was denied the right to apply for the LRO position cannot be treated as a failure to promote claim because her

-13-

job of EEO Manager was better compensated than the LRO position.

Even treating Watson's claim that she could not apply for the CPM as a failure to promote, she cannot establish her prima facie case. For a failure to promote to constitute an adverse employment action, the plaintiff must be (1) a member of a protected class; (2) who applied for and was qualified for a promotion; (3) who was considered for and denied a promotion; and (4) other similarly qualified employees who were not members of the protected class were given promotions. *Allen*, 165 F.3d at 410. Watson never applied for the CPM position. She merely inquired about it. Moreover, Watson was not considered for and denied the CPM promotion because the position was never filled. Although Watson asserts that Genesis Brown filled the position, she put forth no evidentiary support for her theory.

Because Watson was not considered for and denied a promotion, she cannot establish a prima facie case. Consequently, the defendants are entitled to summary judgment on her racial discrimination claim.

### B. Retaliation

Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed [violations of Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-(3)(a). A plaintiff, who has no direct evidence of retaliation, can establish retaliation with circumstantial evidence under the *McDonnell-Douglas* framework. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). The plaintiff must make out a prima facie case of retaliation by establishing four elements: (1) the plaintiff engaged in an activity protected by Title

VII; (2) the defendant knew that the plaintiff exercised his or her rights; (3) the defendant took an employment action against the plaintiff that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action. *Burlington N. & Santa Fe Rwy. Co.*, *v. White*, __ U.S. __, 126 S. Ct. 2405, 2415 (2006); *DiCarlo,* 358 F.3d at 420.

Once again, Watson cannot make out a prima facie case because she was not subjected to an adverse employment action. The Supreme Court recently defined what constitutes an adverse employment action in the retaliation context. *Burlington N.*,126 S. Ct. at 2414-16. In *Burlington N.*, the Supreme Court held that an adverse employment action is any action, which might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotations omitted). Whether an employment action is materially adverse to a reasonable employee depends on the context in which the action takes place. Under the circumstances in this case, Watson was not subjected to an adverse employment action. Watson lost responsibility for two EEO investigations, was excluded from some meetings, and did not receive a raise.[4] In context, these actions would not dissuade a reasonable employee from invoking the protections of Title VII. A reasonable employee would not have found these actions materially adverse. A reasonable employee would have realized that Watson's responsibility for the two EEO investigations was taken away to prevent a conflict of interest and that Watson's exclusion from meetings was an oversight or

---

[4] Watson's claim that she was constructively discharged cannot establish the adverse employment action required for the prima facie case because Watson has not demonstrated that she was constructively discharged. *See supra* Part I.C.

reflected that the meetings were unrelated to Watson's work for the City. Likewise, a reasonable employee would have realized that Watson did not receive a raise because raises were given in conjunction with promotions or in commemoration of long-term service to the City. Given that a reasonable employee would not have found the actions Watson complains of materially adverse, the defendants are entitled to summary judgment on her retaliation claim.

### C. Constructive Discharge

Under Title VII, an employee who resigns her post can recover from her former employer for constructive discharge under Title VII if the employer engaged in conduct that forced the employee to quit. "[T]he employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Our Circuit has adopted several factors to aid the determination of whether the employer created working conditions that a reasonable person would find intolerable. *Logan v. Denny's Inc.*, 259 F.3d 558, 569 (6th Cir. 2001). The presence of any combination of the following factors suggest constructive discharge , although whether working conditions are intolerable must be determined on a case-by-case basis: "(1) demotion; (2) salary reduction; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign; or (7) offers of early retirement or continued employment on less favorable terms." *Id.*

(quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Considering these factors and the severity of the conduct that they are designed to capture, we conclude that Watson was not constructively discharged. The only factor that Watson claims to have been involved is reduction in job responsibilities. As noted above, however, Watson's job responsibilities were not reduced. She remained responsible for new EEO complaints and existing investigations, except for the two that were transferred to independent investigators. Those investigations were not transferred to independent investigators to reduce Watson's job responsibilities or force her to resign. They were transferred to avoid potential conflicts of interest created by Watson's EEO complaint. The defendants neither created working conditions that were intolerable to a reasonable person nor intended to force Watson to resign. Accordingly, the defendants are entitled to summary judgment on her constructive discharge claim.

D. § 1983

Section 1983 "afford[s] remedies against discrimination in employment on the basis of race." *Daniels v. Bd. of Educ. of Ravenna City Sch. Dist.*, 805 F.2d 203, 207 (6th Cir. 1986). These remedies are available only if the plaintiff proves intentional discrimination by a public employer that violates the Equal Protection Clause. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988); *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987). Proving intentional discrimination for an equal protection claim brought under § 1983 requires the plaintiff to make the same showing required to prove a violation of Title VII. *Gutzwiller*, 860 F.2d at 1325. Therefore, "the shifting evidentiary burdens set out in the leading Title VII cases of *McDonnell Douglas* and *Burdine* are applicable to § 1983 cases." *Kitchen*, 825 F.2d at 1011.

-17-

The application of the *McDonnell Douglas* framework to Watson's § 1983 claim prevents her from proving that she was denied equal protection of the laws by the defendants. She can no better make the evidentiary showings required for *McDonnell Douglas* for the purposes of this claim than she could for her Title VII claim.

E. Civil Conspiracy

Ohio law provides for civil liability for perpetrators of civil conspiracies. "[A] civil conspiracy consists of the following: (1) a malicious combination; (2) of two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

Watson has not introduced evidence to support her claim of civil conspiracy. Beyond her testimony, which alone will not preclude summary judgment, *Trs of the Painters Union Deposit Fund*, 113 F. App'x at 668, she has no proof that the Civil Service Rules were violated or that they were violated by the defendants with malice. Watson also has not alleged any actual damages that she suffered. Without an injury to her person or property, she cannot make out a claim for civil conspiracy. Presumably, Watson is relying on what she cast as denial of her right to apply for the LRO and CPM positions as her injury. This, however, does not constitute an injury to property because Watson had no property interest in prospective civil service employment. *See Howard v. City of Southfield*, 97 F.3d 1452 (Table), 1996 WL 518062, at *6 (6th Cir. 1996). ("[E]ven applicants who successfully completed all of the requirements and therefore remained on the eligibility list had no property right in the position since the number of qualified applicants

-18-

significantly exceeded the number of available positions.").

F. Fraud

Claims of common law fraud require proof of six elements in Ohio: (1) a representation or, where there is a duty to disclose, a concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) an injury proximately caused by the reliance. *Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991).

Watson has brought forth insufficient evidence to support her claim of fraud. Specifically, she presented no evidence that the defendants had an intent to defraud beyond her conjecture that they were reserving posts for Caucasian supporters of Mayor Campbell. Moreover, Watson has not alleged any injuries that she sustained as a result of the alleged misrepresentations about hiring by the defendants. Without some evidence, which Watson has failed to amass, her fraud claim cannot survive summary judgment.

G. Negligent Hiring, Retention, and Supervision

Negligent hiring, retention, and supervision claims under Ohio law require proof of five elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries. *Linder v. Am. Nat'l Ins. Co.*, 798 N.E.2d 1190, 1197 (Ohio Ct. App. 2003).

Watson's claim that Romero was negligently hired, retained, and supervised cannot survive summary judgment because Watson only has evidence to support the first element of the cause of action. She has no evidence to suggest that Romero was incompetent or that the City and Mayor Campbell knew of his incompetence. More importantly, Watson has not identified any injury she suffered at the hands of Romero or any harmful act that he committed. From her complaint it appears that Watson is alleging that she was injured when Romero discriminated against her, but she never substantiates this allegation. Moreover, she cannot substantiate this allegation because she failed to prove that Romero discriminated against her when her Title VII and § 1983 claims required it. Apart from her failure of proof on the other elements of her claim, Watson's negligent hiring, retention, and supervision claim cannot survive summary judgment because she has not put forth evidence of harmful discrimination by Romero.

## VI.

For the foregoing reasons, we affirm the district court.